IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 05-cv-01090-BNB-CBS

NATHANIEL HARVEY,

Plaintiff,

v.

ADAMS COUNTY SHERIFF'S OFFICE,
ADAMS COUNTY, COLORADO,
T.S.M. GREGORY, Technical Services Supervisor, in her official and individual capacity,
S. FULLER, Detention Specialist, Programs Coordinator, in his official and individual capacity,
CAPTAIN JAMES WILBOURN, in his official and individual capacity,

Defendant.

---

# ORDER

---

This matter is before me on the defendants' **Motion for Summary Judgment and
Memorandum Brief in Support** [Doc. #129, filed 11/20/08] (the "Motion"). The Motion is
GRANTED IN PART and DENIED IN PART.

## I.  STANDARD OF REVIEW

In ruling on a motion for summary judgment, the facts must be viewed in the light most
favorable to the party opposing the motion and that party must be afforded the benefit of all
reasonable inferences to be drawn from the evidence.[1]  Adickes v. S. H. Kress & Co., 398 U.S.

---

[1]The plaintiff initiated this case as a *pro se* litigant.  Counsel entered an appearance on
behalf of the plaintiff on October 12, 2006 [Doc. #73].  The plaintiff filed his Second Amended
Complaint, which is the operative complaint, while represented by counsel [Doc. #95].  Because
the Complaint was filed while the plaintiff was represented by counsel, I do not construe it
liberally.  Counsel later filed a motion to withdraw, which was granted on November 9, 2007
[Doc. #125].  Subsequently, the plaintiff filed his response to the summary judgment motion.
Because the plaintiff was proceeding *pro se* when the response was filed, I afford the response a

144, 157 (1970). Rule 56(c), Fed. R. Civ. P., provides that summary judgment may be rendered if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986). The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial. Id. at 324.

Only admissible evidence may be considered when ruling on a motion for summary judgment. World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible in evidence. Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." Id.

"The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).

---

liberal construction. Haines v. Kerner, 404 U.S. 519, 520-21 (1972). Nevertheless, I cannot act as advocate for a *pro se* litigant, who must comply with the fundamental requirements of the Federal Rules of Civil Procedure. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

The defendants also assert that they are entitled to qualified immunity on the plaintiff's claims brought against the individual defendants in their individual capacities. Qualified immunity shields government officials sued in their individual capacities from liability for civil damages provided that their conduct when committed did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Specifically:

> Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. It is an entitlement not to stand trial or face the other burdens of litigation. The privilege is an immunity from suit rather than a mere defense to liability. When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. The plaintiff must first establish that the defendant's actions violated a constitutional or statutory right. If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct.

Ahmad v. Furlong, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted).

This two-part burden is a heavy one, and it must be met before the defendant bears his initial burden on summary judgment:

> A summary judgment decision involving the defense of qualified immunity is reviewed "somewhat differently" from other summary judgment rulings. When a defendant raises the issue of qualified immunity, the plaintiff must satisfy a two-part test. First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the constitutional or statutory right the defendant allegedly violated was clearly established at the time of the conduct at issue. A right is clearly established only if there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts has found the law to be as the

> plaintiff maintains. Only if the plaintiff establishes both elements
> of the test does the defendant bear the traditional burden of
> showing that there are no genuine issues of material fact and that
> he or she is entitled to judgment as a matter of law.

Scull v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000) (internal quotations and citations omitted).

## II. UNDISPUTED MATERIAL FACTS

As a preliminary matter, I note that the plaintiff submitted a tedious 67 page handwritten response to the Motion. *Response to Motion for Summary Judgment* [Doc. #136, filed 12/19/07] (the "Response"). The Response begins with page two. To avoid confusion, I cite to the CM-ECF page numbers (which begin with page one) when referring to the Response.

Within the Response, the plaintiff includes a two page affidavit. Id. at pp. 25-26. In constructing the undisputed material facts of this case, I use only the statements within the affidavit which are based on the plaintiff's personal knowledge and which set forth facts that would be admissible in evidence.

The Response contains many citations to deposition testimony and documents that are not provided or which do not support the plaintiff's statements. He repeatedly cites to deposition testimony which he has not provided to the Court and which is not included in the defendants' exhibits.[2] In addition, the plaintiff makes numerous factual statements without citation to the record. I do not include among the undisputed facts statements that are not supported by the record. I also note that the Response is replete with arguments which, alone, do not constitute evidence.

---

[2] The plaintiff does not attach copies of any deposition testimony to his brief.

4

Although the Response is divided into sections which are captioned to match the plaintiff's claims and the defendants' defenses, the arguments found within each section are not limited to the entitled claims or defenses. Rather, each section contains a barrage of arguments on many subjects, including claims which are not asserted in the Complaint. To the extent the plaintiff has attempted to assert additional claims in his Response, I will not address claims raised for the first time in a brief opposing a dispositive motion.

For the most part, the Response does not clearly address the plaintiff's claims nor does it cite to evidence which clearly supports the claims. In short, the Response is prolix and confusing. It is not a judicial function to search the entire record for evidence which supports the plaintiff's case. See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995). Instead, it is the litigants' responsibility to provide the court with concise arguments, relevant facts, and specific citations to authorities and supporting evidence. Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).

Nevertheless, in an attempt to liberally construe the Response, I have reviewed the exhibits submitted with the parties' briefs to determine if evidence exists to support the plaintiff's claims. I review only the evidence submitted with the parties' briefs in my analysis of the plaintiff's claims.[3]

The following facts either are uncontroverted or are construed in the light most favorable to the plaintiff, Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998):

---

[3]I note that on June 7, 2006, the plaintiff submitted a 97 page document entitled "Discovery." [Doc. #69.] The plaintiff does not cite to this document in support of his Response. Therefore, I do not consider these materials in my analysis of the summary judgment motion.

1.    The plaintiff was incarcerated in the Adams County Detention Facility ("ACDF") from January 10, 2005, until April 15, 2006.  *Motion*, p. 3, ¶ 1; *Complaint*, ¶ 1.  The individual defendants were employees of ACDF at all times pertinent to the allegations of the Complaint. *Complaint*, ¶¶ 2-4.

2.    During the intake process at ACDF, the plaintiff was asked for his religious belief. The plaintiff wrote "monotheism" and verbally conveyed the word "monotheism."[4]  *Motion*, Ex. A, 24:8-23.

3.    The plaintiff first asked for a Kosher diet on February 11, 2005, one month after entering the facility.  *Complaint*, ¶ 15.

4.    ACDF offered the plaintiff a vegetarian diet.  The plaintiff accepted the offer. *Motion*, Ex. A, 77:25-78:10.

5.    The plaintiff was provided with an English Qur'an and, later, with an Arabic Qur'an. *Motion*, Ex. A, 75:7-11.  He was also given an accurate prayer schedule.  Id. at 73:25-74:10.

6.    The plaintiff was never denied the opportunity to pray individually in his cell.  Id. at 26:18-23.

7.    During the plaintiff's incarceration at ACDF, no Muslim religious services were offered.  Id. at Ex. B, 115:13-17.

---

[4]Monotheism is "the doctrine or belief that there is only one God."  *Webster's Encyclopedic Unabridged Dictionary of the English Language* (2001).  Throughout the text of his Response, the plaintiff refers to monotheism as the equivalent of Muslim.  E.g. *Response*, p. 3, first full paragraph; p. 14, second full paragraph.  However, this definition is not supported by the dictionary, nor is it supported by the plaintiff's own testimony, wherein he also defines monotheism as the belief in one God and differentiates monotheism from the Muslim faith. *Motion*, Ex. A, 22:1-6.  See also id. at 23:20-24:4.

8. The plaintiff never requested personal visitation from any religious leaders. *Motion*, p. 4, ¶ 9. He did, however, make an unsuccessful attempt to contact a religious leader to hold services at ACDF. Id. at Ex. A, 34:7-35:3.

9. The plaintiff was never denied access to any religious materials that were available at ACDF, that he purchased, or that were voluntarily sent to him. *Motion*, p. 4, ¶¶ 8-11; *Response*, pp. 7-8, ¶¶ 8-11.

10. The inmate population in 2005 was approximately 1,200. Id. at Ex. C, ¶ 6.

11. The average population of Muslim inmates at ACDF is estimated to be approximately 10 to 15 at any given time. Id. at ¶ 5.

12. The regular inmate diet and the vegetarian diet cost $0.9770 per inmate meal. The Kosher diet costs approximately $2.45 per inmate meal. Id. at ¶ 7.

The Complaint asserts six claims for relief. Claim One alleges that the plaintiff was denied a Kosher diet in violation of his First Amendment rights and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.* Claim Two alleges that the plaintiff was denied a Kosher diet in violation of his equal protection rights. Claim Three alleges that the plaintiff was denied religious materials in violation of his First Amendment rights and RLUIPA. Claim Four alleges that the plaintiff was denied religious materials in violation of his equal protection rights. Claim Five alleges that the plaintiff did not have access to Islamic religious services in violation of his First Amendment rights and RLUIPA. Claim Six alleges that the plaintiff did not have access to Islamic religious services in violation of his equal protection rights. The plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, costs, and attorneys fees. The Complaint is not verified.

# III. ANALYSIS

This action is brought under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

## A. Individual Capacity Claims

### 1. First Amendment Claims

Claims One, Three, and Five assert violations of the plaintiff's First Amendment rights. In Claim One, the plaintiff alleges that the defendants denied his requests to receive Kosher meals. Claim Three alleges that the defendants denied the plaintiff Islamic religious materials. Claim Five alleges that the defendants denied the plaintiff's requests to have access to Islamic religious services.

The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Although inmates retain First Amendment rights, those rights are not without reasonable limitations. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives--including deterrence of crime, rehabilitation of prisoners, and institutional security." Id. In addition:

> In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually

charged with and trained in the running of the particular institution
under examination. To ensure that courts afford appropriate
deference to prison officials, we have determined that prison
regulations alleged to infringe constitutional rights are judged
under a "reasonableness" test less restrictive than that ordinarily
applied to alleged infringements of fundamental constitutional
rights. We recently restated the proper standard: When a prison
regulation impinges on inmates' constitutional rights, the
regulation is valid if it is reasonably related to legitimate
penological interests. This approach ensures the ability of
corrections officials to anticipate security problems and to adopt
innovative solutions to the intractable problems of prison
administration and avoids unnecessary intrusion of the judiciary
into problems particularly ill suited to resolution by decree.

Id. at 349 (internal quotations and citations omitted).

In order to establish a constitutional violation of his right to free exercise of religion, the

plaintiff bears the initial burden of demonstrating that the restriction substantially burdened his

sincerely held religious beliefs. Boles v. Neet, 486 F.3d 1177, 1182 (10th Cir. 2007). The

Supreme Court has defined a "substantial burden" as one that "put[s] substantial pressure on an

adherent to modify his behavior and to violate his beliefs," Thomas v. Review Bd. of Ind.

Employment Sec. Div., 450 U.S. 707, 718 (1981), or one that forces a person to "choose between

following the precepts of her religion and forfeiting [governmental] benefits, on the one hand,

and abandoning one of the precepts of her religion . . . on the other hand." Sherbert v. Verner,

374 U.S. 398, 404 (1963). The definition of substantial burden does not include "incidental

effects of government programs, which may make it more difficult to practice certain religions

but which have no tendency to coerce individuals into acting contrary to their religious beliefs."

Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-51 (1988).

If the plaintiff carries his burden to show a substantial burden, the defendants then bear

"the relatively limited burden of identifying the legitimate penological interests that justif[ied]

the impinging conduct." Boles, 486 F.3d at 1182.  The burden then returns to the plaintiff to show that the prison's interests were irrational.  Kay v. Bemis, 500 F.3d 1214, 1219 n.2. (10th Cir. 2007).

In evaluating the prison's interests, the court must balance four factors identified in Turner v. Safley, 482 U.S. 78, 89-91 (1987), to determine whether the restriction was reasonable. Kay, 500 F.3d at 1218-19.  The factors are: (1) the existence of a rational connection between the restriction and a legitimate penological interest advanced as its justification; (2) the presence of alternatives for the inmate to exercise the right; (3) the effect that elimination of the restriction would have on guards, other prisoners, and prison resources; and (4) the existence of alternatives for prison officials without restricting inmates' rights to religious expression.  Boles, 486 F.3d at 1181.

### a.  Religious Diet

The plaintiff testified that he requested a Kosher diet at ACDF because a Halal diet (the preferred diet for Muslims) was not available, and a law in the Qur'an provides that Muslims are allowed to eat the food of the Jews. *Motion*, Ex. A, 51:2-9.  In his affidavit, the plaintiff states that Halal and Kosher products are certified to be free of "forbidden" substances. *Response*, p. 25, ¶ 4.  Meats must be prepared by certain people and from certain animals which are slaughtered using the proper technique, and Kosher meat is certified to be properly slaughtered and from permitted animals.  Id. at p. 27, ¶ 7.  The plaintiff testified that when he was incarcerated in Canon City he would not eat pork or beef from their regular menu because "it was questionable simply because of the way that the animal was slaughtered." *Motion*, Ex. A, 51:25-52:1; 55:10-25.  He also states that it "is an act of ingratitude to Allah to eat a vegetarian

diet unless one has a medical condition that prevents one from consuming meat products."

*Response*, pp. 25-27, ¶ 6.

The defendants argue that their refusal to provide the plaintiff with a Kosher diet did not substantially burden his religious beliefs because he was given a vegetarian diet which the plaintiff admitted in his deposition is acceptable and in conformance with his religious beliefs. *Motion*, p. 8. The defendants cite to the following testimony from the plaintiff's deposition to support their argument:

> Q:    So by eliminating the meat out of the diet, you felt like your diet was acceptable and within the confines of your religious beliefs?
>
> A.    Most definitely.

Id. at Ex. A, 57:2-5.

The quoted testimony is taken out of context. The plaintiff testified that an "alternative" diet provided to him *at a prison in Canon City* was acceptable and within the confines of his beliefs:

> Q:    So at Canon City, you were basically eating a vegetarian diet?
>
> A:    Well, you can call it a vegetarian diet, but I wouldn't. Alternative [meat] is something given in lieu of the meat that you don't particularly want to eat. Like if they served beef, they might give you as an alternative tuna fish, which is ideal, because I love tuna fish. But it would make--it just very well may be a lot of other different things that's agreeable. And that's what it's for, is because they know people don't eat a lot of this stuff because of religious reasons or medical reasons. I don't know.
>
> Q:    Did you feel like your religious needs were met by being able to exclude meat from your diet?
>
> A:    At what point? In my lifetime or --
>
> Q:    When you were at Canon City, did you feel like that was an acceptable diet for you and your religious beliefs?

11

A:      What I felt was acceptable and agreeable was the fact that, well, we know
        that people don't eat certain things, so we'll accommodate them with
        something else.  That was most acceptable and agreeable, yes.

**Q:      So by eliminating the meat out of the diet, you felt like your diet was
        acceptable and within the confines of your religious beliefs?**

**A.      Most definitely.**

Id. at 56:3-57:5 (emphasis added).

The defendants further argue that denying the plaintiff a Kosher diet at ACDF did not

substantially burden his religious beliefs because the plaintiff "testified that he had been served a

meat-free diet since leaving ACDF and has been satisfied with those diet alternatives."  *Motion*,

p. 8.  However, the plaintiff did not testify that he has been satisfied with a meat-free diet since

leaving ACDF.  He testified that he did not request a Halal diet when he was incarcerated at the

Denver Reception and Diagnostic Center ("DRDC") because he was only there for two months.

Id. at Ex. A, 51:10-22.  The record does not contain a description of his diet at DRDC.  He

further testified that he is currently on a Halal diet at the Sterling Correctional Facility

("Sterling"), and that the Halal diet includes soy-based meat.  Id. at 57:6-7; 60:14-61:23.  He did

not testify that the Halal diet at Sterling is meat-free; he testified only that the Halal meat is a

soy-based product, which is not necessarily the same as a meat-free product.

The defendants also appear to argue that consumption of the regular diet at ADCF did not

substantially burden the plaintiff's religious beliefs because the regular diet complied with the

Muslim requirements.  Melanie Gregory, the Technical Services Manager for ACDF, id. at Ex.

C, ¶1, testified that ACDF does not provide Kosher meals to Muslim prisoners because the

Kosher meals are not the same as Halal, so the jail is not meeting the Muslim requirements by

providing Kosher meals to Muslims.  Id. at Ex. B, 24:21-25:8.  She considers the regular diet to

be appropriate for Muslims because "the facility serves absolutely no pork and we serve no gelatin that is made from animal products." Id. at 23:23-24:5.[5]

The plaintiff's testimony and statements in his affidavit establish that a pork-free diet is not sufficient to meet his religious needs; meats must be prepared by certain people and from certain animals which are slaughtered using the proper technique. Based on this evidence, I find that a dispute of material fact exists regarding whether ACDF's regular and vegetarian diets met the plaintiff's religious diet requirements. In addition, the plaintiff has met his burden of demonstrating that the defendants' denial of a Kosher diet substantially burdened his religious beliefs. The burden now shifts to the defendants to show that a legitimate penological interest justified their refusal to provide the plaintiff with a Kosher diet.

The defendants argue that they denied the plaintiff's requests for a Kosher diet based on the legitimate penological interests of (1) maintaining order and structure at ACDF and (2) financial concerns. *Motion*, p. 9. Ms. Gregory testified that ACDF has a practice of allowing religious diet accommodations only for those inmates who declare specific religious beliefs upon entering the facility. Id. at Ex. B, 106:13-107:15; 184:1-8. She stated that ACDF had a situation where a number of inmates were abusing Kosher meals. Id. at 22:19-22; 25:9-22. In 2005, the inmate population at ACDF was approximately 1,200. Id. at Ex. C, ¶ 6. ACDF was providing approximately 10 to 12 Kosher meals for Muslim and Jewish inmates. Id. at 187:20-24.

---

[5]Ms. Gregory also testified that she inquired about obtaining Halal meals, but only two providers were found and they were "out of sight as far as cost, plus would have been a long -- would have been a drive from Brighton to Denver and back on a regular basis to bring this food in." Id. at 54:12-55:9. In addition, for the jail to prepare Halal meals, it would have to keep separate utensils "and such in the cooking area." Id. at 55:10-15.

Approximately half of those inmates were "abusing it." Id. at 188:15-18. The following is Ms. Gregory's description of the burden incurred by ACDF as a result of the abuse:

> Because they were taking things from other people. In other words, a person who was supposed to be eating kosher might order something nonkosher. Or in some cases, they were taking nonkosher items from other people. That's a theft. That means a whole official police report, in some cases, depending on the value, but at minimum, an internal type of disciplinary action. It results in fights, depending who has what and who's allowed to have what. Coverups.
>
> And one person, say, is Jewish and the roommate is Mormon, for lack of a better comparison, and for us to prove who had what -- and it's very important in our system that internal disciplinary and our rules and -- and controls and security. I mean, people fight over the craziest things.

Id. at 188:19-189:12.

According to Ms. Gregory, the normal diet and the vegetarian diet cost $0.9770 per inmate meal. Id. at Ex. C, ¶ 7. The Kosher diet costs approximately $2.45 per inmate meal. Id.

Sterritt Fuller, the ACDF Detention Specialist and Program Coordinator, *Complaint*, ¶ 3, described the burden of providing Kosher meals to Muslim inmates as follows:

> A.    I do see it as being burdensome in just cost. I believe, again, that you would be discriminating against all the other inmates in preference towards a religious minority. You would be spending two and a half times as much per day on their diet as you would be the other inmates.
>
> So I'm saying if -- if the guy was agnostic and getting our -- our meals for $3 a day and you're paying 7.52 a day for the kosher meals, all the inmates would eventually become Muslim in the facility and who wouldn't be opting for the $7.52 a day because they think they're getting a lot better for -- what's going on.

Whether or not that's true or not -- in most cases it's not, but the perception is the reality. I think we'd -- we'd gravitate eventually towards an overwhelming -- so we -- two and a half times our food cost in order to -- to provide this non-inmate touched food is what it's all about.

Q: But that hasn't happened with regard to -- you don't have prisoners all saying they're Jewish now?

A: No. Because most of them don't think about it. Don't have a reason to lie. Whereas, the whole Muslim thing, personal observation has been that the sincerity there has been less than the Jewish. I would say that it would be equal for the Messianic Jews versus the Muslim inmates, that the lack of sincerity is equivalent.

So it's really about getting something or a perception of getting something that is -- I -- they think that it's been tainted by the inmates, that they're going to spoil their own nest. And I think anything could be furthest from the truth, that since the inmates that prepare the food have to eat the same things, they're not going to do horrible things to their own food.

So it's the perception game for most of them. It's not truly about religion. There are -- there are some that are very sincere and devout about it, but overall, most of them, it's about getting something, playing the system.

Id. at Ex. D, 106:3-107:19.

I turn now to the Turner balancing test to determine whether the defendants' refusal to provide plaintiff with a Kosher diet was reasonable. The first factor is whether a rational connection exists between the denial of Kosher meals and the defendants' justifications for denying the meals. The defendants assert that they were justified in denying the plaintiff a Kosher diet because of the extra cost of Kosher meals and because of the need to maintain

structure and order in the jail. This first factor tips in favor of the defendants because the Tenth Circuit Court of Appeals--acknowledging that the showing required to meet this factor is minimal--has held that "[w]ithout doubt, prison administrators have a legitimate interest in working within a fixed budget. Moreover, there is a legitimate concern that other inmates might react negatively to providing some prisoners with a kosher diet." Beerheide v. Suthers, 286 F.3d 1179, 1186 (10th Cir. 2002).

The second factor is whether alternatives existed for the plaintiff to exercise his right. The only alternatives available to the plaintiff were the regular diet, which contained items prohibited by his religious beliefs, and the vegetarian diet, which is prohibited unless mandated by a medical condition. Thus, the alternatives offered by ACDF were not adequate.

The third factor is the effect that providing Kosher meals to the plaintiff would have on guards, other prisoners, and prison resources. To the extent the defendants have asserted that inmates have abused or would abuse the Kosher diet, which would lead to difficulty maintaining order and structure at ACDF, Ms. Gregory's and Mr. Fuller's descriptions of the abuses were vague and conclusory, as were Ms. Gregory's assertions of theft, fights, and coverups. Thus, there is inadequate evidence in the record to show that ACDF guards, prisoners, or other resources would be impacted by increased disorder resulting from providing the plaintiff with a Kosher diet.

The defendants state that "allowing inmates to change their expressed religious preference in order to obtain a special diet at two and a half times the cost of the regular diet poses an obvious financial burden on the facility." *Motion*, p. 11. Although the defendants provide evidence of the added cost of Kosher meals, there is no evidence regarding ACDF's

meal budget or how the provision of Kosher meals to the plaintiff would have affected the budget. Nor is there any evidence of the number of prisoners who have changed their religious preference to request a Kosher diet. Therefore, the record does not support the defendants' conclusory assertion of a financial burden on ACDF.

The defendants also state that ACDF does not "have the staff resources to allow inmates to change their classification status multiple times while at ACDF." Id. Ms. Gregory testified that "we don't have staff--every time someone wants to change religion, we don't have the staff go to interview them and try to understand the sincerity, if you will, of their religion." Id. at Ex. B, 110:1-4. There is no evidence, however, regarding the number of prisoners who have attempted to change their religion while incarcerated at ACDF, the number of available staff, or the amount of time it would take a staff member to effect a change of religion.

The fourth factor is whether alternatives existed for the jail officials without restricting the plaintiff's rights to religious expression. The defendants state that their vegetarian diet satisfies this factor. *Motion*, p. 11. I have found, however, that the plaintiff has produced sufficient evidence to create a material fact dispute regarding whether the vegetarian diet was an acceptable alternative meal.

I cannot say, based on the record now before me, that the defendants' actions in denying the plaintiff a Kosher diet were reasonable under the First Amendment. The plaintiff has sufficiently demonstrated that the defendants' actions violated his First Amendment rights for purposes of the qualified immunity analysis.

The next issue is whether the plaintiff has demonstrated that his First Amendment right was clearly established at the time he was denied a Kosher diet. Although his brief is disjointed

and confusing on this point, the plaintiff does cite <u>Beerheide v. Suthers</u>, 286 F.3d 1179 (10th Cir. 2002), where the circuit court determined that the Colorado Department of Corrections' failure to provide Kosher meals to Orthodox Jewish inmates violated the inmates' First Amendment rights. The <u>Beerheide</u> case clearly establishes a First Amendment right of an inmate to a diet conforming to his religious beliefs, and it was decided in 2002. Consequently, the plaintiff has established that his right to a diet conforming to his religious beliefs was clearly established when he was incarcerated at ACDF in 2005 and 2006.

As discussed above, a material fact dispute exists regarding whether ACDF's regular and vegetarian diets are sufficient to meet the plaintiff's religious needs. In addition, the defendants have failed to establish that their failure to provide the plaintiff with a Kosher diet was reasonable. Therefore, they are not entitled to qualified immunity or to judgment as a matter of law on this claim.[6] The Motion is DENIED insofar as it seeks summary judgment on the allegations of Claim One that the plaintiff's First Amendment rights were violated when he was denied a Kosher diet.

### b. Religious Materials

Claim Three alleges that the plaintiff was denied religious materials in violation of his First Amendment rights. The plaintiff testified that he requested an Islamic book called Hadith, and the defendants denied his request because they did not have the book in stock. *Response*, p. 30; *Motion*, Ex. A, 80:5-81:24. The plaintiff does not provide any evidence to show that the

---

[6]I do not make any judgment or finding regarding whether the defendants will be able to produce adequate evidence at trial.

defendants' failure to provide a copy of Hadith upon request substantially burdened his religious beliefs.

Ms. Gregory testified that ACDF's budget for acquiring written materials encompasses legal books, recreational books, and GED books, in addition to religious reading materials. *Motion*, Ex. B, 185:13-22. The budget for religious materials is limited because the law books and the GED materials are extremely expensive. Id. at 186:11-15. If an inmate requests a particular book, ACDF will send it to him if they have it in their library. Id. at 186:1-11. If not, the jail will purchase it if there are sufficient funds and if it is available for purchase. Id. at 186:11-12. In addition, ACDF inmates are allowed to receive religious publications from churches, ministries, and publishers. Id. at Ex. E, §16i.

Mr. Fuller testified that, if the library does not have requested materials, he will direct the ACDF chaplains to call and request that the materials be donated. If the materials cannot be obtained through donations or family members, he will eventually purchase it if he can find it. Id. at Ex. D, 35:12-36:16.

Mr. Fuller further testified that on March 11, 2005, the plaintiff asked for a Qur'an in Arabic and English, and asked if ACDF had a Hadith. Id. at 31:21-32:7. Mr. Fuller responded that ACDF had Qur'ans in English only, and he told the plaintiff to contact the local mosque for a possible donation. Id. at 32:8-10. Mr. Fuller talked to other inmates and learned that the preferred form is Arabic. Id. at 32:17-19. He then had another employee contact the mosque in Fort Collins to see whether it could donate any Arabic-English Qur'ans, but the mosque did not respond to the inquiry. Id. at 33:2-8. He searched on-line to determine if there were sources

available for purchase.  Id. at 33:9-11.  He bought the Arabic-English Qur'ans and a few copies of Hadith sometime in 2005 or 2006.  Id. at 33:11-34:16.

The plaintiff does not provide any evidence to demonstrate that the defendants' inability to provide him with the requested Islamic reading materials "put substantial pressure on him to modify his behavior and violate his beliefs" or otherwise substantially burdened his religious beliefs.  He was given an English Qur'an, which provided him with religious reading material.  Moreover, he was free to request additional religious materials from a mosque or a publisher.  Requiring ACDF to purchase religious materials upon request would have an obvious impact on the other inmates' ability to secure reading materials and on ACDF's budget for reading materials.  Mr. Fuller exercised the alternatives available to ACDF without restricting the plaintiff's rights by requesting that an employee attempt to procure a donation of the materials, and when that was unsuccessful, by actually purchasing the materials.  The plaintiff has failed to establish that the defendants' failure to provide additional reading materials violated his First Amendment rights.  Therefore, I do not determine if his rights were clearly established for purposes of qualified immunity, and the defendants are entitled to summary judgment on this claim.  The Motion is GRANTED insofar as it seeks summary judgment on the allegations in Claim Three of a First Amendment violation.

### c.  Religious Services

Claim Five alleges that the plaintiff's First Amendment rights were violated because the defendants denied his requests to have access to Islamic services.  The plaintiff does not provide any evidence to demonstrate that the defendants' failure to hold Islamic services "put substantial

pressure on him to modify his behavior and violate his beliefs" or otherwise substantially burdened his religious beliefs

The plaintiff admits he was told that ACDF would hold Islamic services if there was an outside religious leader available to conduct them.  Ex. A, 28:25-29:1; 34:13-16.  It is undisputed that the plaintiff was given the opportunity to contact a religious leader to hold services at ACDF; his attempt was unsuccessful; and he was never denied the opportunity to pray individually in his cell.

The plaintiff has failed to establish that the defendants' denial of his requests to have access to Islamic services substantially burdened his right to free exercise of religion in violation of his First Amendment rights.  Therefore, I do not determine if his rights were clearly established for purposes of qualified immunity.  The Motion is GRANTED insofar as it seeks summary judgment on Claim Five's allegations of a First Amendment violation.

## 2.  RLUIPA Claims

Claims One, Three, and Five assert violations of RLUIPA based on the defendants' failure to provide the plaintiff with a Kosher diet, Islamic religious materials, and Islamic religious services.  RLUIPA provides that "[n]o government[7] shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability" unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  The term

---

[7]The term "government" includes any official of a "State, county, municipality, or other governmental entity created under the authority of a State" and any other person "acting under color of State law."  Id. at § 2000cc-5(4)(A).

"substantial burden" under RLUIPA is no broader than the Supreme Court's articulation of that term. <u>Grace United Methodist Church v. City of Cheyenne</u>, 451 F.3d 643, 661 (10th Cir. 2006).

A plaintiff must "produce[] prima facie evidence to support a claim alleging a violation" of the Free Exercise Clause of the First Amendment or a violation of RLUIPA.  <u>Id.</u> at § 2000cc-2(b).  The government bears "the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether [the challenged practice] substantially burdens the plaintiff's exercise of religion."  <u>Id.</u>

### a.  Religious Diet

Claim One alleges that the defendants denied the plaintiff's requests to receive Kosher meals in violation of RLUIPA.  I have already found that the plaintiff produced evidence to support his claim that denial of a Kosher diet violates his rights under the First Amendment. Because the defendants have not established that the failure to provide a Kosher diet was reasonable under the First Amendment, they also have failed to meet RUILPA's more demanding standard that their restriction be "in furtherance of a compelling governmental interest" and be the "least restrictive means of furthering that compelling governmental interest." The Motion is DENIED insofar as it seeks summary judgment on the allegations of Claim One regarding violation of RLUIPA.

### b.  Religious Materials and Religious Services

Claims Three and Five allege that the defendants violated RLUIPA when they denied the plaintiff Islamic religious materials and access to Islamic religious services.  I have already determined that the plaintiff failed to provide any evidence showing that the defendants' actions substantially burdened his exercise of religion.  Therefore, the plaintiff has failed to meet his

initial burden under RLUIPA. The Motion is GRANTED insofar as it seeks summary judgment on the allegations of Claims Three and Five regarding violations of RLUIPA.

### 3. Equal Protection Claims

Claims Two, Four, and Six assert violations of the plaintiff's equal protection rights based on the defendants' failure to provide him with a Kosher diet, Islamic religious materials, and Islamic religious services. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quotations and citation omitted). To sustain a claim under the Equal Protection Clause, the plaintiff must make a prima facie showing that he was treated differently from others who are similarly situated and that the acts forming the basis of the claim were motivated by a discriminatory purpose. Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1179 (10th Cir. 2003). Because the plaintiff is a prisoner, his equal protection claims are analyzed using the Turner analysis. Washington v. Harper, 494 U.S. 210, 223-24 (1990); Patel v. Wooten, 15 Fed.Appx. 647, 650 (10th Cir. 2001).

#### a. Religious Diet

Claim Two alleges that the defendants violated the plaintiff's equal protection rights because they denied the plaintiff's requests for Kosher meals based on his religious needs, but were providing Kosher meals to Jewish inmates to meet their religious needs. The defendants argue that the claim must fail because the plaintiff does not allege or provide evidence of a discriminatory purpose. *Motion*, p. 18.

Mr. Fuller testified that if ACDF did not limit Kosher meals to Jews, "all the inmates would eventually become Muslim in the facility."  This discussion followed:

> Q:    But that hasn't happened with regard to -- you don't have prisoners all saying they're Jewish now?
>
> A:    No.  Because most of them don't think about it. Don't have a reason to lie.  Whereas, the whole Muslim thing, personal observation has been that the sincerity there has been less than the Jewish.  I would say that it would be equal for the Messianic Jews versus the Muslim inmates, that the lack of sincerity is equivalent.
>
> So it's really about getting something or a perception of getting something that is -- I -- they think that it's been tainted by the inmates, that they're going to spoil their own nest.  And I think anything could be furthest from the truth, that since the inmates that prepare the food have to eat the same things, they're not going to do horrible things to their own food.
>
> So it's the perception game for most of them.  It's not truly about religion.  There are -- there are some that are very sincere and devout about it, but overall, most of them, it's about getting something, playing the system.

Id. at Ex. D, 106:22-107:19.

Mr. Fuller's testimony creates a material fact dispute regarding whether the defendants' denial of Kosher meals to Muslims was motivated by a discriminatory purpose.  Moreover, the plaintiff's affidavit contains statements which create a material fact dispute regarding whether the plaintiff was similarly situated to Jewish inmates with respect to his need for a Kosher diet. *Response*, pp. 25-27, ¶¶ 4, 7.  Thus, the plaintiff has made his threshold showing that he was treated differently from other, similarly situated inmates and that the defendants' acts underlying

the claim were motivated by a discriminatory purpose.  When I apply the <u>Turner</u> balancing test, <u>supra</u> pp.15-17, I cannot conclude that the defendants' actions in denying the plaintiff a Kosher diet were reasonable under the First Amendment.  Accordingly, the Motion is DENIED insofar as it seeks summary judgment on Claim Two.

### b.  Religious Materials and Religious Services

Claim Four alleges that, in violation of his equal protection rights, the defendants denied the plaintiff Islamic religious materials while providing religious materials to other inmates of different faiths.  Claim Six alleges that in violation of his equal protection rights, the defendants denied the plaintiff access to religious services while providing access to religious services to other inmates of different faiths.

To survive summary judgment on these claims, the plaintiff must make a threshold showing that he was treated differently from others who were similarly situated.  <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1312 (10th Cir.1998).  The plaintiff does not provide any evidence showing that he was treated differently from similarly situated inmates with regard to the defendants' failure to provide religious materials and services.  There is no evidence that inmates of other religious faiths received religious materials upon request if they were not available in the ACDF library, or that inmates of other religious faiths were provided religious services if no outside religious leader was available to hold the service.  To the contrary, the plaintiff testified that the books received by Christian inmates came from the library.  In addition, the plaintiff testified that although he attended Christian services at ACDF in 2005, he never observed Christian services held without an outside religious leader in attendance.  *Motion*, Ex. A, 27:18-

28:3; 83:19-25. The Motion is GRANTED to the extent it seeks summary judgment in favor of the defendants on Claims Four and Six.

### B. Official Capacity Claims

The defendants seek summary judgment on all claims against the County, the Sheriff's Office, and the individual defendants in their official capacities arguing that the plaintiff has failed to establish that the defendants were acting pursuant to an unconstitutional custom, policy, or practice. *Motion*, pp. 19-20.

A suit against a local government official in his or her official capacity is the equivalent of a suit against the local government. Monell v. New York City Department of Social Services, 436 U.S. 658 n.55 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. A policy is a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the entities' officers. Id. at 690. A custom is a "persistent and widespread ... practice[] of ... officials." Id. at 691 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168 (1970)).

The only remaining claims are the religious diet claims. The defendants have argued that they denied the plaintiff a Kosher diet because he did not declare himself a Muslim during the intake process. *Motion*, p. 9. Ms. Gregory testified that it was the longstanding unwritten practice at ACDF that the "inmate assessment form is the--the only place that determines what religion you get to be while you're there." Id. at Ex. B, 106:8-107:13. She also testified that she

has the authority to change the practice.  Id. at 183:8-25.  Therefore, evidence exists to create a material fact dispute regarding whether the defendants were acting pursuant to an unconstitutional custom, policy, or practice.  The Motion is DENIED to the extent it seeks summary judgment on the claims against the County, the Sheriff's Office, and the individual defendants in their official capacities.

### C.  Claim for Injunctive Relief

The defendants assert that the plaintiff's claim for injunctive relief must be dismissed as moot because the plaintiff is no longer incarcerated at ACDF.  Where entry of injunctive relief in the plaintiff's favor would have no effect on the defendants' behavior toward him, the plaintiff's request for injunctive relief must be denied.  Green v. Branson, 108 F.3d 1296, 1300 (10th Cir. 1997).  The plaintiff requests that the Court "[e]nter any appropriate injunctive relief." *Complaint*, p. 9.

An order for injunctive relief relating to the plaintiff's claims would have no effect on the defendants' behavior toward the plaintiff because he is no longer in the custody of the defendants.  Therefore, the claim for injunctive relief against the defendants must be dismissed. The Motion be GRANTED insofar as it requests that the plaintiff's claim for injunctive relief be DISMISSED AS MOOT.

### D.  Failure to Allege Physical Injury

The defendants assert that the plaintiff is not entitled to compensatory damages because he did not suffer a physical injury as required by the Prisoner Litigation Reform Act ("PLRA"). The PLRA provides in pertinent part:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional

> injury suffered while in custody without a prior showing of
> physical injury.

42 U.S.C. § 1997e(e).

Section 1997e(e) applies regardless of the nature of the underlying substantive violation asserted. Searles v. Van Bebber, 251 F.3d 869, 876 (10th Cir 2001) (applying section 1997e(e) to the plaintiff's First Amendment claim for free exercise of religion). Although section 1997e(e) bars recovery of compensatory damages for failure to allege physical injury, it does not bar recovery of punitive damages or declaratory relief. Id. at 881 (noting that punitive damages may be awarded for constitutional violations without a showing of compensable injury); Perkins v. Kansas Dept. of Corrections, 165 F.3d 803, 808 (10th Cir. 1999).

The plaintiff has not submitted any evidence to demonstrate that he suffered a physical injury as a result of the defendants' actions. Therefore, the plaintiff's claims are barred to the extent they seek compensatory damages. The Motion is GRANTED insofar as it seeks summary judgment on the plaintiff's claims for compensatory damages.

### E. Failure to Allege Personal Participation of Defendant Wilbourn

The defendants assert that the claims against defendant Wilbourn must be dismissed because the plaintiff has failed to allege that Wilbourn personally participated in the alleged violations. An individual cannot be held liable in a section 1983 action unless he caused or participated in an alleged constitutional violation. McKee v. Heggy, 703 F.2d 479, 483 (10th Cir. 1983). Respondeat superior is not within the purview of section 1983 liability. Id. In order for a supervisor to be liable under section 1983, there must exist a causal connection or an affirmative link "between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Butler v. City of

Norman, 992 F.2d 1053, 1055 (10thCir. 1993); <u>see also</u> <u>Rizzo v. Goode</u>, 423 U.S. 362, 371 (1976). Without a showing of direct responsibility for the alleged violations, liability will not be imposed on a supervisory official. <u>Id</u>.

The defendants provide the deposition testimony of Wilbourn where he states that he did not learn of the plaintiff's complaints until he received papers showing he was being sued by the plaintiff. *Motion*, Ex. F, 24:20-25:2. The Complaint states only the following with regard to Wilbourn:

> Defendant Captain James Wilbourn ("Wilbourn"), at all relevant times was employed at the ACDF. He was responsible for making sure that ACDF regulations with regard to allowing inmates to observe their religious faith were observed by ACDF staff. Defendant Wilbourn is sued in his official and individual capacities who under color of state law deprived Plaintiff of his rights, privileges, or immunities secured by the Constitution and laws of the United States.

*Complaint*, ¶ 4.

The Complaint does not contain any factual allegations to show that Wilbourn was directly responsible for the alleged violations, and the plaintiff does not provide any evidence to demonstrate that Wilbourn was directly responsible. The Motion is GRANTED to the extent it seeks dismissal of defendant Wilbourn for failure to show personal participation.

## IV.  CONCLUSION

IT IS ORDERED that the defendants' Motion for Summary Judgment and Memorandum Brief in Support is GRANTED IN PART and DENIED IN PART as follows:

1.  DENIED insofar as it seeks summary judgment in favor of the defendants on Claims One and Two;

2.    GRANTED to the extent it seeks summary judgment in favor of the defendants on

Claims Three, Four, Five, and Six;

3.    DENIED to the extent it seeks summary judgment on the claims against the County,

the Sheriff's Office, and the individual defendants in their official capacities;

4.    GRANTED insofar as it requests that the plaintiff's claim for injunctive relief be

DISMISSED AS MOOT;

5.    GRANTED to the extent it seeks summary judgment on the plaintiff's claims for

compensatory damages; and

6.    GRANTED to the extent it seeks dismissal of defendant Wilbourn for failure to show

personal participation.

Dated June 4, 2008.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge